Good morning, Your Honors. My name is Susan Handelman and I'm appearing on behalf of the KPMG Long-Term Disability Plan and Liberty Life, its administrator and fiduciary. And where I'd like to begin, Your Honors, is with where this case is undisputed. It is undisputed that this is an ERISA governed plan, employment benefit plan, that is involved here. It is undisputed that the district court said in reviewing de novo the fiduciary's denial of benefits to Mr. Blankenship that benefits should have been provided. And so the benefits are not in dispute. Liberty Life, as the fiduciary, will go ahead and pay those. What is not in dispute is that there was an offset to the benefits that the court awarded. The court awarded $277,219.48 worth of benefits, and it was undisputed between the parties in the trial court that Social Security benefits, SSDI, is an offset to that. And so the total amount awarded on the benefits was reduced to $227,072. That's undisputed. Also undisputed is attorney's fees. At the end of the day, the plaintiff asked for what he wanted in attorney's fees, was not opposed, and it's not disputed today. The only two points of dispute are important ones, though, and as a fiduciary for the plan, and given that it is an ERISA situation, we're raising the points, and they're important to the outcome. One of the points is prejudgment interest, the rate at which prejudgment interest was awarded here, and the other point is another offset, an offset for retirement benefits. And I'm going to start with the interest because it's more confined of the two points. And I want to go back to a case we began. First of all, the Court awarded 10.1 percent prejudgment interest compounded monthly. So on a $200,000 benefit slightly over that, the Court awarded $74,000 in prejudgment interest, and that was opposed in the trial court. How often do we usually compound prejudgment interest? Annually or? Annually. It can be compounded annually, and that's typically if it's compounded at all because it's typically simple interest. But if it's compounded at all, it is annually. But here's where I'd like to go back, and that is to the Blanton case. There are a few ERISA cases where prejudgment interest has been awarded. But the Blanton case is a case in which a judge can be participated in a long time ago in 1987. And in Blanton, the Court of Appeals, this Court said that a 7 percent prejudgment interest had to be sent back to the trial court because the prejudgment interest that should be applied typically is the same interest rate as is applied by statute post-judgment, which is the Section 1961 52-week T-bill rate. What would that have been? In this case? What figure would that have been? In this case, it would have been 2.41 percent, I believe, and as opposed to the, let's use it, 2.10 percent. The average T-bill rate. The average T-bill rate would have been 2.10 as opposed to the 10.1 percent that the Court awarded. In Blanton, this Court said that there was a strong public policy in favor of applying the post-judgment interest rate unless the trial judge articulates a reason why in equity some greater amount is required. And in the case of Nelson v. EGG Energy, in which Judge Noonan participated in 1994, the Court there said that they should have used — oh, no, I'm sorry, the Court did use the T-bill rate, and the claimant said, oh, I should have been awarded more. The Court of Appeals said no, the T-bill interest rate is what should apply. More recently, in Gross-Solomon, the interest rate was awarded at the 52-week T-bill rate. The claimant there said, I think I should get 10 percent, and the Court said no, that that was not the appropriate rate. There is no case that we have found, and no case cited in briefing here, where the Ninth Circuit Court of Appeals has used prejudgment interest as a penalty, no case where the Court has allowed, without some equitable reasoning, to apply a greater interest rate than the T-bill rate. And here, the difference is dramatic. If, with offsets, the amount of interest that would have been awarded is slightly over $2,000, and here $74,000 was awarded. It's plain what happened. Certainly. My testimony was, if I hadn't had to pay this money out, I would have left it in these funds that were gaining 10 percent annually. That's clear. That's what happened. That's what the — and it's an interesting declaration that the claimant supplied after the trial, and it's interesting how the briefing has gone here. There has been very careful denunciation in the Respondent's briefing that he, in fact, did deposit, because, you know, he was paid benefits for two years, and then the benefits stopped. There was never any evidence that this claimant put his benefits that he did receive over the two years into this particular 10.1 percent interest-bearing account. And if you look at the declaration that supports that 10.1 percent account, and this has been repeated in briefing, that account was said to have gained 10.1 percent in its existence since 2000, and at the time of briefing it was 2004. Well, if you look at the one-month rate of interest, it was .99 percent the most recent month, what was attached to the declaration, not 10 percent per month. So even though the court said he had a reason for saying 10.1, it wasn't as if he had picked it out of the air. He had a reason for saying 10.1. There was no reason stated in equity why this, why a greater rate than the 4.0 or 2.10 that would have applied under the T-bill rate should have been applied. Well, if you take the declaration as true, it states that the equity is there in the declaration. No, the amount is supported in the declaration. But the reasons, he feels he's been deprived of that, so it's equitable to restore it. And ERISA does not allow a claimant to have compensation in that manner. ERISA is a special statute. I would agree, Your Honor, if it were a different type of case where we were looking for damages and looking to compensate the defendant, or the plaintiff rather, for his losses. ERISA is a special animal, and ERISA does not permit an award of damages. In ERISA, you're just trying to do equity. And no case has awarded prejudgment. No case we could find anywhere has awarded prejudgment interest based on a claim by the claimant that he could have gotten a better interest rate had he invested the funds privately. In fact, what they look at is making sure that the plan hasn't unjustly been enriched by not having paid out the funds. So there is one case where, on the one hand, the claimant said, I know that the insurance company, and there was substantial evidence that the insurance company made more money than the federal T-bill rate on the funds that were withheld, not paid, to the claimant. And the court said, I don't feel that is sufficiently strong. In fact, that was the court on which you served in the Gross-Solomon case, Your Honor, where the court said that is not a sufficiently strong reason to depart from the federal T-bill rate. So, I mean, what we have – it's a very defined issue, and no – We don't know what the enrichment of the insurance company was, do we? No, there is no evidence on that score. You might want to send it back for that? It could be sent back for that, but, on the other hand, it could be sent back simply to apply the federal rate, because had enrichment of the insurance company been something that the plaintiffs were trying to pursue, that evidence could have been developed in discovery. Your Honors have interrogatories, and you have a lot of the discovery before you.  Could you have challenged the declaration? We challenged the award of interest. I mean, could you have challenged it? Could you have submitted interrogatories to the plaintiffs? Not by – oh, I'm sorry. By the time the declaration – Could you have done that? Oh. At the time the declaration was submitted, the trial was over. Could you have done that? But could you have done it? Not at that point. You could have probably gone back and asked the district court judge for authorization to take his deposition in light of that declaration. I suppose that – If that – He said no, but you could have asked. True. Or served him with some interrogatories. You were saying they could have asked interrogatories. The question, of course, is why couldn't you have done the same? Well, because what he earned on the money is irrelevant. That is – You thought it was not a legal issue, but it turned out you were mistaken. You didn't cover all the bases. No, that's not so, Your Honor. I respectfully disagree with that statement because as we progressed through this trial, all of the issues in the case were briefed. The issues in the case were, is this gentleman deserving of benefits? Were the benefits not properly – were not paid and they should have been paid? And that was briefed extensively on both sides. And in the briefing that was submitted on which the court made its decision, the question was what kind of office sets apply? If the money is owed, how do you figure this out given the wording of the ERISA plan here? And that was briefed. The other side, the plaintiff's side, never briefed those issues. And when the trial was over, requested an opportunity, or when the case was submitted to the court, asked for an opportunity to brief those things. So by that time, it was quite late in the game and the issues were before the court. So whether – what he was claiming post-trial, as far as what gains he made in his accounts on other money, was not the point. What the point was is that the cases, the public policy of the state favors strongly, in the words of this very court, strongly favors the imposition, if there's going to be prejudgment interest at all in an ERISA case, and there are, as I say, a few cases where it has been awarded. If there's going to be prejudgment interest at all, the court has to make a finding on substantial evidence on the equities, why a greater sum than the T-bill rate should be applied. And here the court didn't find anything on the equities as to why a greater sum should be applied. It found a means, an explanation as to what the 10.1 percent represented. And we oppose that, and to this day it does not – it is not in consonance with other California cases, other Ninth Circuit cases, other U.S. cases on ERISA. In fact, it is not exactly clear whether prejudgment interest is a proper remedy under ERISA. I'm assuming it is. You would dispute that, wouldn't you, though? Well, I – we're not – we're not suggesting here that the court should not award interest. We're just suggesting if the court is going to award prejudgment interest, which the trial court said it was going to, that it be at the federal rate. That's all. How do you address the offset issue? On the offset issue, I – You're running out of time. Sure. On the offset issue, the question is whether or not Mr. Blankenship received his retirement benefits. The plan requires – well, first of all, on the – he received an October 31st letter. It's ER-874, which says you are eligible to receive your retirement benefits. On December 3rd, after he made an election as to how he wanted to deal with these retirement benefits, it says you received a lump sum of $29,000 in pension, and it talks – it says and it confirms that they will distribute over $750,000 – it was $761,000 into a retirement account, an IRA at his Vanguard operation. The question is whether he received those retirement funds, and then the operative part of the plan, which tells how a lump sum is to be set off against benefits that are received for disability. That provision of the plan says that you distribute – you pretend as if those – that lump sum is going to be distributed to him over his lifetime, and for so long as he receives disability benefits, the monthly payments for retirement are to be set off. Well, did he receive them, or did Vanguard receive them? By all – by every – he received them, Your Honor. He did. Well, strangely, they ended up with somebody else's – somebody else was in charge of them. He is in charge of them, but they're in his Vanguard account. Well, you know, this really seems to me, at least, to involve the law of trust, and when a trustee gets something and holds it for a beneficiary, the trustee receives it, not the beneficiary. Well, Your Honor – Would you dispute that? I would dispute that it is a trustee. It could be an agent. The – under the Commissioner v. Banks analysis – Dispute that Vanguard was in a trustee position. Oh, not at all. Under the IRS rules, he could roll over – Did you answer that question? Was Vanguard a fiduciary? Yes. Was it a trustee? I'm not sure that that was briefed, but I would suppose that it was. And isn't that law, generally, that when a trustee receives something, the beneficiary does not receive it? It's held in trust for the beneficiary. The plain language of the – of the plan – I'm talking about the plain language of trust. The plain language of trust – it depends on what the trust says. And in this case, even though the trustee, if you call it that, if the IRA is considered the trustee for those funds, even though those funds were rolled into his trust, Mr. Blankenship is 59-and-a-half years old in excess of that. He has exclusive right to choose how and when he wants to use those funds. Now, I admit, I agree, he hadn't spent the funds. To the best of our knowledge, they were rolled straight into that IRA, and he could spend them, keep them, or do as he will with them. He could will those funds to his family members. But the point is, is that those funds, while at one point they were in the hands of KPMG and were not usable directly by Mr. Blankenship, the minute those funds rolled into – the moment he received a distribution of those funds, whether he chose them into an IRA, whether he chose them to go into his bank account, those funds were received by him under the terms of the plan. Is that because he's 59-and-a-half? Over 59-and-a-half, yes. Over 59-and-a-half, is that because? Because he can use them at that point without any penalty. How about before 59-and-a-half? Before that time, he – under the tax laws, he incurs a penalty if he uses those funds. He can still use them, correct? Sure. Once they're in – within his possession and control. But before that, they were in the KPMG plan, and they had to be – They're not in his possession, are they? They're in his – No, answer that question. He – yes. They're not in his possession. They're in his agent's possession, therefore they're in his possession. Yes, they are. So in that – in that sense, what we have is an individual who has received – he has been distributed funds, and those funds should be set off against – and the math for that is set off in the – or is explained in the briefing. I'm going to reserve – I just have a bit of time left, and I'm going to reserve what's left for rebuttal. Good morning, Your Honor. Scott Kalkin on behalf of Mr. Blankenship. First off, let me address this interest issue. I think both the Dishman case and the Nelson case specifically allow for – I'm sorry – for the interest that was provided by the court in this case. Quoting from the Dishman case, it says – it demands the case back for the district court to choose a pre-judgment interest rate that compensates the losses he incurred as a result of Unum's non-payment of benefits, rather than whatever the rate Unum earned. I'm paraphrasing now. And it actually says it might be 16 percent. It might be higher. The Nelson case, which counsel has referred to, also talks about – and I'm on page 1391 – pre-judgment interest is intended to cover the lost investment potential of funds to which the plaintiff was entitled. Now, that's exactly what happened in this case. In other words, what Liberty is saying here is if we owe you a dollar and we wait three years to pay you and then give you the dollar, that that's an equivalent value, and that's not the case. Well, they're saying, you know, use the T-bill rate. Well, they're saying to use the T-bill rate. We're too low. You're right. At the moment. But what happened here – I'm sorry, Your Honor, I didn't mean to cut you off. No, I just say, yeah, the T-bill rate is low at the moment, but sometimes it's much higher than this. Sure. But the evidence in this case was that if Mr. Blankenship would have had the money monthly and he got it on a monthly basis from Liberty or was supposed to get it on a monthly basis from Liberty, his own funds would have been invested in the fund that was only 10.1 percent. And there's substantial evidence in the record for that proposition. It wasn't paying 10.1 percent the whole time, though. Yes, it was, Judge. According to this declaration, the little attachment to the declaration? There's a Mr. Blankenship attached assignment. Right. I have that right here in front of me. I think that, in fact, I'm – It says since inception 6-29-2000, it was 10.01 percent. Right. But the three years immediately preceding the date of this document, it was earning 8.87 percent. And as counsel pointed out, the month previously before this declaration, it was earning .99 percent for that one month. I think that what Mr. Blankenship did, and I would ask the Court to recall that he is an accountant and a tax auditor, he looked at that information, the information on the Court's website – not the – sorry, the Fund's website, and came to that conclusion. And he's certainly qualified to make that conclusion. I can't address for you what the Fund earned in the month before. I'm sorry. I don't have it in front of me. Well, I was just looking at his declaration, what he attached to it. Right. So that's the only evidence that was before the Court. I would say that there's substantial evidence. It's not clearly erroneous for the Court to have made that finding based on what was in front of it. And that's what the Court awarded. So I think it was well within the law to do so. With respect to the issue of offset, I think the thing to keep in mind here is, with both respect to the issue of receipt and whether or not Mr. Blankenship was double-dipping, the fact is that not one cent of the monies that we're talking about have been put in his pocket. They were basically moved from point A to point B. And if you carry Liberty's analysis to the extreme, he also had the option to at least be part of that money in the KPMG plan. So if he would have made the election to leave it where it was, would they still be claiming that they're entitled to an offset? It's ridiculous. So, frankly, I don't think that's the case. It's interesting. I mean, somebody who's really hard up and has denied payments by an ERISA plan skims along and doesn't eat and things like that and then gets paid at the T-bill rate. And then the next person comes along and he keeps his extra money in a Berkshire Hathaway fund and gets 35 percent interest when he's paid the denied payments. It is somewhat anomalous, I would agree with you. But it seems to be – I mean, if we look at Dishman and Nelson, that seems to be what the purpose of interest is supposed to be in this context. See, I guess if I understand your opponent's argument, it's that equity – something that has to go into the equity balance is that you do have an ERISA fund involved and there are other beneficiaries of the fund. And the question is, well, you know, how – In this particular context, Text Judge, I have a little bit of a problem with that because we've got an insurance company that's paid a premium to do this. We're not talking about KPMG losing any money. There's no evidence in the record that someone else is going to go without benefits. So I don't know that that's exactly correct here. It's not a self-funded plan. Exactly. So I – frankly, I think the issues have been fairly well set out in my brief. I don't have anything further to say unless the Court has any particular questions. I don't think I have any further questions. Thank you for your time. Are you going to talk about the other one? Excuse me? I was going to ask you some questions about this. Go back. I'm sorry. I mean, you heard counsel answer that Vanguard was the agent. Now, what's your objection to that? If your agent receives something, you receive it. Vanguard was a fiduciary. What's that? Vanguard was a fiduciary just as KPMG was a fiduciary. No, but an agent's a fiduciary. So you deny that Vanguard was an agent? No, I don't. For certain purposes, it was an agent, of course. Okay. Well, once an agent gets a hold of that, doesn't the principal have – doesn't the principal receive it? No. Not in this particular context because what we're looking at is whether there was an actual distribution of this money under the IRB. Well, it's a distribution that puts it totally in his control, not – No, there wasn't, Your Honor. He had control that he lacked. He didn't gain anything more. I don't – that's my question. That's not the – he doesn't gain anything more. He does get control. He had the same control as if he would have left those funds in the KPMG plan, which was an option for him. Well, in other words, he can send a wire to Vanguard today and say, deposit $200,000 to my account. Yes, he can. In my own bank account. So I've got it. Or send it to my house. He can do that. Yes, he can. And he can certainly, over the age of retirement age, he can do that. And he could have done that if he would have left the money with KPMG. Well, that's true, but he didn't leave it there. It went to Vanguard, and he now can do anything he wants with it. How can you say that's not received? Because received – the way you have to look at received here is by virtue of how it's defined in the tax code. For tax purposes. It's a pension plan. Those are the rules it's governed by. So when one writes a plan, one has all those things in mind about how – Do you mind keeping your voice up a little bit? I'm sorry. I'm sorry. So I believe that the proper inquiry is to look at how those funds would be treated under the Internal Revenue Code, and they were not actually distributed because they were transferred from point A to point B. Never touched Mr. Blankenship's hands, if you will. And so that's the way I think the case should be looked at because there was, like I say, there was a third option here or another option where he could have left the funds exactly where they were. They'd be able to make the same argument. So that means that anybody who has a retirement account and becomes disabled at that stage in their life automatically loses those benefits because of an offset. That doesn't seem right to me. Well, I suppose people who can afford to do it will wait until they're 70 and a half, and then they'll start to take it out in a rateable period aimed at their life expectancy, basically. And I suppose at that point, offset would occur. Well, no, because the – If they were still receiving payments from – Well, if they were still receiving payments, right. The payments here only go until he was 68 because he became disabled after the age of 60. 62, actually, I believe, when he became disabled. So that wouldn't work in this particular case, but in principle, yes, you're correct. If the Board has nothing further, I'd submit it. Thank you. I just have three quick points to make. First is on Dishman. My opponent says Dishman supports his side as regards prejudgment interest. Dishman says, awarding 16 percent interest on this rationale was an abuse of discretion. Prejudgment interest cannot be used as a penalty. Although a defendant's bad faith conduct may influence whether a court awards prejudgment interest, it cannot or it should not influence the rate of interest. As far as Nelson supporting the other side's view, the – Nelson says, we have held that the interest rate prescribed for post-judgment interest is appropriate for fixing prejudgment interest unless the trial judge finds on substantial evidence that the equities of that particular case require a different rate. As far as the claimant's options, he could have allowed the money to stay, and he could not have taken the money. There could have been no distribution if he had let the money stay at – just as was pointed out at KPMG in its account. But instead here, he asked to receive the money in his own IRA, and he now controls it, and it should be used as an offset. Didn't he control it? Couldn't he have ordered a payout before – I guess he couldn't before he retired. He could not because he had not retired. Was that a taxable event when it went to Vanguard? No. Apparently not. But there is nowhere in the plan – and that's a good point that you raise because nowhere in the plan does the plan suggest that whether monies are received and how benefits are figured are in any way connected with the tax code. And, in fact, IRAs and IRA rollovers are all afforded special treatment under the tax code, and nowhere in the ERISA plan does it even suggest that the tax code is relevant to any analysis of plan benefits. Anything further? Yes. Thank you. The matter will be submitted.
judges: Canby, Noonan, Paez